**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., <br><br> Plaintiffs <br><br> v. <br><br> HEWLETT PACKARD ENTERPRISE CO., <br><br> Defendant | Civil Action No.: 4:18-cv-468 <br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. ("Plaintiffs") file this Complaint against Defendant Hewlett Packard Enterprise Company ("Defendant" or "HPE" or "HP") seeking damages and other relief for patent infringement, and allege with knowledge of their own acts, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, et seq.

2.      Plaintiffs seek damages and prejudgment and post-judgment interest for Defendant's infringement of the Patents-in-Suit, as defined below.

3.      The Patents-in-Suit and their underlying patent applications have been cited by over 30 issued United States patents and published patent applications.  Moreover, the World Intellectual Property Association (hereafter "WIPO") has also cited Plaintiffs' Patent Portfolio,

see details below, giving it the highest prior art designation, in rejecting Defendant's patent application filing related to mobile application development.

## PARTIES

4.      Plaintiff Wapp Tech Limited Partnership is a Delaware limited partnership organized and existing under the laws of the State of Delaware, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

5.      Plaintiff Wapp Tech Corp. ("WTC") is a body corporate organized and existing under the laws of the Province of Alberta, Canada, and its registered agent for service of process in Delaware is Corporations & Companies, Inc. (CorpCo), 910 Foulk Road, Suite 201 Wilmington, Delaware 19803.

6.      Defendant Hewlett-Packard Enterprise Company is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Palo Alto, CA. Defendant's registered agent for service of process in Texas is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

7.      Defendant has an established place of business in the Eastern District of Texas at 5400 Legacy Drive, Plano, Texas 75024.  Defendant does business in Texas, directly or through intermediaries, and offered products or services, including those accused herein of infringement, to customers, and potential customers located in Texas, including in the Eastern District of Texas.

## JURISDICTION AND VENUE

8.      On information and belief, Defendant is registered to do business in the State of Texas.

9.      On information and belief, Defendant conducts business operations throughout the State of Texas, and within the Eastern District of Texas, in facilities in Houston and Plano, Texas.

10.     Defendant lists on its website open jobs at its Plano, TX address.  *See, e.g.,* https://careers.hpe.com/job-location/plano/solution-sales-representative/3545/8503043/60251 (last accessed July 2, 2018).  As of July 2, 2018 at the HPE Careers website, setting the City filtering field to Plano results in 32 job postings having "Plano, TX" as a primary location, including "Storage and Hyper-Converged Subject Matter Expert," "Vice President, 5G Telco North America Sales Leader," "Senior VLSI Design or Verification Engineer," "Inside Solution Architect," "Continuous Integration DevOps Engineer," "Cyber Security Compliance Analyst," "3PAR PEAK Ecosystem Manager," and "Program Manager, Channel Competitive Intelligence." *See*  https://careers.hpe.com/search-jobs/Plano?orgIds=3545&alp=6252001-4736286-4682500-4719457&alt=4 (last accessed July 2, 2018).

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). Venue is proper under 28 U.S.C. §§ 1391(a) & (c), and 1400(b).

## INTRODUCTION

12.     The inspiration for the patented innovations described herein originates from Plaintiffs' application development work associated with the 2006 FIFA World Cup sponsored by Adobe and Nokia.  The FIFA World Cup is the largest single-event sporting competition in the world with fans simultaneously accessing the World Cup app from millions of mobile devices around the globe.  Through its development work associated with this international sporting event,

the principal inventor of the Patents-in-Suit developed and created its patented performance engineering platform.  Application performance engineering enables software design and testing before it is published to a consumer by simulating real-world conditions for app developers while in the development phase, including device and network virtualization, virtual user modeling and the ability to virtually perform stress and load tests based on modeling human interaction (hereafter "Performance Engineering Innovations").

13.    Licensed products incorporating the Performance Engineering Innovations have won numerous industry awards for mobile application development, including multiple JOLT Awards and other industry leading awards for market breakout products.

14.    Patents related to the Performance Engineering Innovations have been licensed by a Fortune 500 leader in enterprise software in a multi-million dollar license.

15.    In addition, patents in the Plaintiffs' Patent Portfolio, defined below, have been cited against a number of industry-leading companies as prior art by the United States Patent and Trademark Office (hereafter "USPTO") and WIPO.  These companies include:

- Hewlett-Packard
- Apple
- Samsung
- Microsoft
- Google
- Vodafone
- Intuit
- Avaya
- Intel
- Amazon
- HTC
- Nextbit Systems
- CA
- Facebook
- Barco
- Razor
- Adobe

**HPE & MICRO FOCUS**

16.     Certain HPE software products are alleged herein to infringe the Patents-in-Suit.

17.     On information and belief, HPE completed a spin-out merger of its software group with Micro Focus on September 1, 2017.  Following the spin-out merger, the term "HPE" was replaced by the term "Micro Focus" in the names of various software products.  For example, HPE LoadRunner became Micro Focus LoadRunner, HPE Performance Center became Micro Focus Performance Center, etc.

18.     On information and belief, functionality of relevant software products remained consistent following the spin-out merger.  Consequently, where Micro Focus documentation is cited below, it is to be understood that, on information and belief, the referenced functionality existed in the corresponding HPE software products.

**TECHNOLOGY BACKGROUND**

NETWORK VIRTUALIZATION

19.     On information and belief, to simulate mobile networks from any geographic location worldwide for mobile application testing (hereafter "Network Virtualization"), Defendant enabled performance engineers "to virtualize real-world network conditions, analyze test results to detect and remediate performance bottlenecks before deployment and gain custom performance optimization recommendations."[1]   Defendant further states that "integrating [Network Virtualization] with your continuous integration testing process takes your automated CI [continuous integration] tests way beyond traditional functional testing and load testing, delivering to your developers timely actionable analytics and optimization recommendations."[2]  Additionally, Defendant states that "[Network Virtualization] is a vital tool for performance engineers…[and] is

---

[1] https://www.youtube.com/watch?v=lUznCBjocYw (accessed June 25, 2018).
[2] *Id.*

fully integrated with HPE LoadRunner, HPE Performance Center and HPE StormRunner Load…[and] HPE Mobile Center."[3]

NETWORK PROFILES

20.     On information and belief, as part of a HPE Software Suite, Defendant provided a library of real-world mobile and broadband network conditions (hereafter "Network Profiles"), enabling its customers to have access to a library of real-world data points of point-to-point network conditions recorded around the world.   Documents regarding a post spin-out merger version of the HPE Software Suite state that Micro Focus "provides a library of real-world mobile and broadband network conditions."[4]   Further, "Network Virtualization for Mobile allows tests to be managed and results analyzed from any laptop or Wi-Fi-connected mobile device. The software can import real-world mobile network profiles captured by Micro Focus Network Capture or provided by the Micro Focus Network Virtualization Library of mobile and broadband network conditions."[5]  Network Profiles and cloud-enabled technology has been described as bridging "the gap between development and deployment by enabling your mobile application development team to fully and accurately assess the behavior and impact of the network on mobile apps before they are introduced to end users. By virtualizing real-world mobile network conditions within testing environments, your test results are more reliably predictive of how an application will behave for end users."[6]

---

[3] *Id.*
[4] Micro Focus Network Virtualization for Mobile Data Sheet, Page 1 https://www.microfocus.com/media/data-sheet/network_virtualization_for_mobile_ds.pdf (accessed June 27, 2018).
[5] *Id.*
[6] *Id.*

<u>VuGEN AND THE VIRTUAL EVENT GENERATOR</u>

21.     On information and belief, to simulate virtual users to load test mobile applications (hereafter "Virtual Users" or "Vuser") within the HPE Software Suite, Defendant offered a virtual event generator (hereafter "Virtual Event Generator").  Documents regarding a post spin-out merger version of the HPE Software Suite state that the Virtual Event Generator is the "primary tool for creating testing scripts that emulate the behavior of real users on your system."[7]  A Virtual User is defined as scripts that replace "real users with virtual users…to emulate the actions of a human user"[8] for load testing.  On information and belief, from a single workstation, Defendant offered a controller to distribute "each Vuser in the scenario to a load generator. The load generator is the machine that executes the Vuser script, enabling the Vuser to emulate the actions of a human user."[9]  The Vuser operates as a single thread process, enabling a single server or computer to emulate the actions of several 100 users to create load against a mobile application.

22.     In March of 2014, Defendant migrated its long-standing license model from a standard license to a cloud-based monetization model[10] wherein customers of the HPE Software Suite would be charged on a per Virtual User basis over a 24-hour time period.[11]

<u>TRUCLIENT AND SCRIPTED USER EVENT MODELING</u>

23.     On information and belief, to create Virtual Users to interact with scripted events to model human interaction with a native mobile application (hereafter "Scripted User Event

---

[7] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/VuGen/tocs/toc_MainVuGen.htm (accessed June 27, 2018)
[8] Micro Focus LoadRunner Help Center, https://admhelp.microfocus.com/lr/en/12.56-12.57/help/WebHelp/Content/Controller/c_terms_lr.htm (accessed June 27, 2018)
[9] Micro Focus LoadRunner Help Center, *Id.*
[10] http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WzQUBdVKguV (accessed June 27, 2018)
[11] https://software.microfocus.com/en-us/products/loadrunner-load-testing/pricing; https://software.microfocus.com/en-us/products/performance-center/pricing; https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/pricing (accessed June 27, 2018)

Modeling") within the HPE Software Suite, Defendant offered TruClient as a native mobile protocol that provided a way "to record and replay native mobile applications on both Android and iOS devices" to enable "the developer or DevOps engineer to record user interactions on the mobile application and create a TruClient script"[12] (hereafter "Scripted User Event Modeling") to simulate "multiple virtual users (Vusers)" during the load test's execution.[13]   Additionally, "the script can be enhanced using standard TruClient functionality including parameterization, transactions and JavaScript coding."[14]   Together with the HPE Virtual User Suite of Products, this "protocol is meant for end-user performance testing…[and] completes the LoadRunner mobile performance testing suite."[15]

STORMRUNNER LOAD

24.    On information and belief, Defendant's StormRunner product provided the ability to create a "real-world scenario by generating load from global cloud regions to emulate real networks during load tests."[16]   "StormRunner Load initializes on demand load generation machines in the private or public cloud"[17] to dynamically "Scale from 1 tester to 2,000,000 or more geographically distributed"[18] Virtual Users (hereafter "Cloud-based Load Server Modeling"). StormRunner provided a cloud-based performance testing solution that enabled Agile development teams to ensure app scalability up to millions of distributed mobile users.[19]

---

[12] https://community.softwaregrp.com/t5/LoadRunner-and-Performance/Introduction-to-LoadRunner-s-new-TruClient-Native-Mobile/ba-p/269441#Wyg06FVKguV
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] https://software.microfocus.com/en-us/products/stormrunner-load-agile-cloud-testing/overview (accessed June 27, 2018)
[17] *Id.*
[18] *Id.*
[19] *Id.*

## HPE MOBILE CENTER AND DEVELOPMENT SERVER

25.     On information and belief, Defendant offered HPE Mobile Center as "a standalone server that provides mobile device access to different test applications. HPE Mobile Center supported a distributed architecture where different test clients can all interact with the same Mobile Center server instance."[20]  Defendant enabled performance engineers to gain an "accurate picture of the end-to-end mobile performance" by combining "virtual users and real devices" to run "elastic, and realistic tests from multiple geographies across various real-world network conditions"[21] and "mediate[d] between the testing-tool client calls to mobile devices" by providing "a user interface within the testing tool for recording and running tests on real mobile devices"[22] (hereafter "Cloud-based Mobile Center").

26.     On information and belief, HPE "Mobile Center is a core component of [the] mobile app development lifecycle" and is integrated with "Application Lifecycle Management (ALM), AppPulse Mobile, Business Process Monitoring, Business Process Testing, Fortify On Demand, LoadRunner, Network Virtualization (NV), Performance Center, Sprinter, StormRunner Load, UFT and UFT Pro"[23] (hereafter "HPE Mobile Center Suite of Products").[24]

---

[20] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[21] https://software.microfocus.com/en-us/products/mobile-testing/overview (accessed June 27, 2018)
[22] http://mobilecenterhelp.saas.hpe.com/docs/en/2.20/mobilecenter_help/Content/HPMC_architecture.htm (accessed June 27, 2018)
[23] https://community.softwaregrp.com/t5/Quality-and-Testing-Blog/Introducing-Mobile-Center-2-5-improve-your-mobile-testing/ba-p/1593254#.Wyg_71VKguU (accessed June 27, 2018)
[24] https://www.youtube.com/watch?v=6QyrWGSGq-c (accessed June 27, 2018) and https://www.youtube.com/watch?v=FkJkIe1H_rM (accessed June 27, 2018)

## FACTUAL ALLEGATIONS

### PATENTS-IN-SUIT

27.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,971,678 (the "'678 Patent", attached as Exhibit 1), entitled "Systems including device and network simulation for mobile application development," issued on May 15, 2018.

28.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 9,298,864 (the "'864 Patent", attached as Exhibit 2), entitled "System Including Network Simulation for Mobile Application Development," issued on March 29, 2016.

29.     Plaintiffs are the owner of all right, title and interest in and to U.S. Patent No. 8,924,192 (the "'192 Patent", attached as Exhibit 3), entitled "Systems including network simulation for mobile application development and online marketplaces for mobile application distribution, revenue sharing, content distribution, or combinations thereof," issued on December 30, 2014.

30.     Together, the foregoing patents are referred to as the "Patents-in-Suit".  Plaintiffs are the assignee of the Patents-in-Suit and have all substantial rights to sue for infringement and collect past and future damages for the infringement thereof.

31.     The foregoing patents, and any related patents in the family, are herein referred to collectively and individually as the "Plaintiffs' Patent Portfolio" respectively.

### DEFENDANT'S ACTS

### MOBILE WORLD CONGRESS AND

### WIPO INTELLECTUAL PROPERTY APPLICATION

32.     In a press release dated February 29, 2012, Defendant announced at the GSMA Mobile World Congress (hereafter "Mobile World Congress"), the launch of a software suite to

mobilize Defendant's core offerings, including the mobilization of HP LoadRunner and HP Performance Center for mobile application performance testing (hereafter "HP 2012 Software Suite").[25]

33.     Prior to its announcement at the Mobile World Congress, the world's largest conference for the mobile industry, Defendant filed Patent Application Ser. No. PCT/US2012/024087 with WIPO on February 7, 2012, in an attempt to protect its soon to be released HP 2012 Software Suite.  At the time of filing in a signed declaration, Defendant made a claim of "entitlement, as at the international filing date, to apply for and be granted a patent (Rules 4.17(ii) and 51bis.1(a)(ii))"[26] stating that its disclosures were novel.

34.     Defendant's novelty and non-obvious declarations before WIPO were errant because Defendant's patent application filing was made almost seven years *after* Plaintiffs' 2005 priority date for the Patents-in-Suit involving the same mobile performance engineering technology.  Since Defendant was a late entrant to the mobile application test market,[27] the existence of Plaintiffs' Patents-in-Suit should not have been surprising to Defendant.  Consistent with these facts, Defendant also admitted being a late entrant to the mobile application testing space when a senior product manager for Defendant stated to *eWEEK* that the Defendant's partnership with an outside third party in 2012 brought what Defendant "could not do on its own," further stating that "HP LoadRunner and HP Performance Center and our Shunra partnership

---

[25] http://www.eweek.com/mobile/hp-partners-with-shunra-for-mobile-performance-support (accessed June 27, 2018)
[26] https://patentscope.wipo.int/search//iasr?ia=US2012024087&PAGE=PDF&ACCESS=screen&TOK=NM7x-z_iw3yGR50Mwbk0L0USBCg&psAuth=0c8_i88QJ-YDBlkPkP7W7KeSMfDL6Gkwkkset4IS-c4 (accessed June 27, 2018)
[27] In a press release dated April 28, 2016 Forrester Research stated that "HPE only recently entered the mobile test market with its Mobile Center product" by adding "new mobile testing capabilities to its comprehensive testing suite."
[https://www.forrester.com/report/The+Forrester+Wave+Mobile+FrontEnd+Test+Automation+Tools+Q2+2016/-/E-RES128536] Forrester Research Inc., April 28, 2016 (accessed June 27, 2018).

[completed in February of 2012] delivers the necessary protocols for performance testing both web and native mobile apps."[28]

<u>WIPO PATENT REJECTION</u>

35.     On October 31, 2012, WIPO rejected all of the claims in Defendant's Patent Application Ser. No. PCT/US2012/024087 as being anticipated solely by U.S. Patent No. 7,813,910 ("the '910 Patent," which is a part of Plaintiffs' Patent Portfolio and a parent of the Patents-in-Suit) after conducting a patent search, and in the process awarded the '910 Patent the highest prior art designation (hereafter "WIPO Patent Rejection").  *See* Exhibit H (Written Opinion of the International Searching Authority for International Patent Application Ser. No. PCT/US2012/024087, rejecting all claims over the '910 Patent (which WIPO designated as reference "D1.")).

36.     Further, on October 31, 2012, WIPO provided the following written statements to Defendant under Rule 43bis.1(a)(i) with regard to novelty, inventive step or industrial applicability, stating that Plaintiffs' Patent Portfolio "…which is considered to represent the most relevant state of the art, discloses [HPE's] method and [a] medium or system comprising steps of simulating a cellular network condition for each of a plurality of locations utilizing a network simulation engine, and testing performance of the mobile application for each of the simulated cellular network conditions.  As all of the features of claims 1, 7, 12 are disclosed in [the '910 Patent], these claims are anticipated by [the '910 Patent].  Therefore, claims 1, 7, 12 lack novelty over [the '910 Patent] under PCT Article 33(2)."  *See* Exhibit H.  WIPO further rejected all Independent and all Dependent claims as lacking inventiveness over the '910 Patent under PCT Article (2), (3) and (4).  *See* Exhibit H.

---

[28] http://www.eweek.com/mobile/hp-partners-with-shunra-for-mobile-performance-support (accessed June 27, 2018)

## WIPO WRITTEN NOTICES TO DEFENDANT

37.     On June 12, 2014, WIPO sent an additional supplementary notice under Rule 47.1(c) stating that under Article 22(1) that the communication of the international application will be affected across all 185 member states, including the United States Patent and Trademark Office.[29]

38.     The Intellectual Property Owners Association ("IPO") is an organization whose mission statement is to serve the global intellectual property community,[30] and to help reach judicial decisions and regulatory practices in the United States and abroad to further enhance global intellectual property rights.[31]   On information and belief, Defendant has eight (8) serving members on IPO  Defendant's strong support of IPO, an organization that champions intellectual property rights, underscores that Defendant should have understood the fundamental importance of respecting a third party's patent rights.

## RECKLESS DISREGARD OF WIPO NOTICES

## AND FURTHER PRODUCT RELEASES

39.     Notwithstanding the aforementioned WIPO Patent Rejection of Defendant's patent application based on the '910 Patent, the initial and supplemental WIPO notices and its actual knowledge of Plaintiffs' prior patent rights in the mobile performance engineering space, the Defendant recklessly forged ahead with commercialization and sales of the HP LoadRunner and

---

[29]https://patentscope.wipo.int/search/docservicepdf_pct/id00000025143112/IB308/WO2013119205.pdf?psAuth=m MniZixkvHdFvRyOgxrg3IdDA3uV2jaWveIbtORTsgg (accessed June 27, 2018).
[30] The IPO states that the "Intellectual Property Owner's Association is the premier organization representing the interests of intellectual property owners…and to advocate in favor of intellectual property rights."
[31] https://www.youtube.com/watch?v=mOsnzHRPUkI&feature=youtu.be&t=7 (accessed June 27, 2018).  The IPO further advocates on behalf of IP owners at the U.S. Supreme Court, the Supreme Court of Canada, the World Intellectual Property Organization and for patent holders across 37 countries.

HP Performance Center 11.50 offerings in 2012, and with the follow up launch of HP LoadRunner

and HP Performance Center 12.0 offerings for "Mobile and Cloud-based Application Testing" in

March of 2014[32], including the subsequent release of HP StormRunner Load in September of 2014

as part of the HP Performance Testing Suite[33] and the follow up release of HP Mobile Center in

October of 2014[34], among other additional mobile product offerings (hereafter "Mobile Product

Offerings").[35]

40.    Based on the global WIPO Patent Rejection of Defendant's patent application filing

in October of 2012, and the repeated and supplemental notices from WIPO under Article 22(1)

regarding Defendant's rejected WIPO patent application, Defendant has had actual notice of

Plaintiffs' Patent Portfolio and continued to make, use sell, and offer to sell the Mobile Product

Offerings despite an objectively high likelihood that its actions constituted infringement of

Plaintiffs' patent rights.

41.    Notwithstanding this knowledge about Plaintiffs' patents and the importance of the

mobile performance engineering innovations therein, Defendant has knowingly or with reckless

---

[32] PALO ALTO, Calif. In a Press Release dated March 18, 2014, the Defendant stated the following: "HP today announced *new offerings to accelerate mobile and cloud-based testing and improve user experience while increasing cost savings and quality for the delivery of business-critical applications and services* [emphasis added]… To help improve continuous performance testing for capacity, scalability and reliability, *HP is introducing HP LoadRunner 12 and HP Performance Center 12 with new cloud testing capabilities designed to help organizations* [emphasis added] increase cost savings…and shrink overhead through an integrated management environment that automates provisioning of load generators in the cloud across geographically dispersed teams while maintaining security and control.." http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WyqeK1VKguU (accessed June 27, 2018).

[33] PALO ALTO, Calif. In a Press Release dated September 15, 2014 the Defendant stated the following: "HP today expanded the HP Performance Testing Suite with a new software solution focused on helping Agile development teams accelerate application quality and delivery via a simple, intuitive and scalable cloud-based platform.
HP StormRunner Load joins HP's existing performance testing solutions, which include HP LoadRunner and HP Performance Center. The modern enterprise faces a perfect storm of changes that are driving the need for a completely new approach to application delivery and testing. Businesses must develop applications that can instantly operate across a wide variety of platforms including thousands, or millions, of mobile devices." Source: http://www8.hp.com/us/en/hp-news/press-release.html?id=1791344#.WyqigFVKguU (accessed June 27, 2018)

[34] http://www8.hp.com/ca/en/hp-news/press-release.html?id=1825600#.Wy0Um1VKguU (accessed June 27, 2018)

[35]    https://web.archive.org/web/20141205174207/http://www8.hp.com/us/en/software-solutions/mobile-testing/ (accessed June 27, 2018)

disregard willfully infringed one or more of the Patents-in-Suit, and, accordingly, Plaintiffs seek enhanced damages from Defendant pursuant to 35 U.S.C. § 284.

DEFENDANT SPINOUT MERGER WITH MICRO FOCUS

42.     On the strength of HPE LoadRunner, HPE Performance Center, HPE StormRunner Load, HPE Mobile Center and its other product offerings, HPE and Micro Focus announced on September 7, 2016 their intent to merge HPE's Software Business Segment into Micro Focus in a transaction valued at approximately $8.8 billion, including a $5.5 billion in cash financing note provided by JPMorgan Chase & Co. *See also,* ¶¶ 16-18.

43.     On information and belief, under the terms of a Separation and Distribution Agreement entered between Defendant and Micro Focus, dated September 7, 2016 governing the spin-out merger, Defendant has twenty-four (24) months from September 7, 2016 to obtain licenses and sub-licenses for the benefit of Micro Focus International plc.  Plaintiffs would like Defendant to take advantage of this opportunity to obtain a license on behalf of Micro Focus prior to expiration of the 24-month term.

NON-NOTICE INVITATION

AND WRITTEN COMMUNICATION

44.      In light of Defendant's long-standing stature in the software industry and its support of organizations like IPO, in August of 2017, Plaintiffs, through a personal representative, reached out in a written communication to Jane Smithard, Group General Counsel and Company Secretary of Micro Focus, with a courtesy copy to John Schultz, General Counsel of HPE, seeking to enter a non-notice agreement to engage in open and transparent discussions about Defendant's infringement of the Patents-in-Suit.  While Ms. Smithard did apparently instruct her outside counsel at the Aspen Tech Law firm to contact Plaintiffs' representative, the Defendant never

15

acknowledged the communication nor made any attempt to communicate with Plaintiffs, thus necessitating the filing of this present Complaint.

### DAMAGES, PLAINTIFFS' PORTFOLIO AND THE APP ECONOMY

45.     Mobile apps and the tools to develop and test mobile apps have become paramount to the U.S. economy.  According to a 2012 white paper released by renowned Dr. Michael Mandel titled the 'App Economy', the App Developer community represented the second largest IT segment in the United States in 2012 with over 466,000 jobs created in the U.S. economy alone, up from nearly zero in 2008 when the App Store was initially launched (hereafter "App Economy").[36]

46.     Plaintiffs' goal has been to democratize app development for a new generation of developers by mitigating performance risks and reducing application development cycles from months down to minutes by virtue of new performance engineering modeling.  At the time of Plaintiffs' provisional patent filing in June of 2005, Apple had not launched the iPhone (June of 2007), there was no App Store (July of 2008), Google's Android platform had not been released (September of 2008), the Samsung Galaxy family of devices had not been released (June of 2009) and the mobile app ecosystem that we know today was still in its infancy.

47.     In Dr. Mandel's App Economy white paper, the renowned economist contributes two driving innovations behind the App Economy: (a) the ease of app development; and (b) the ease of app delivery.  With respect to the former, Plaintiffs' Patent Portfolio describes many of the core innovations in modern application development that accelerate the development of applications and enhances the mobile device consumer experience on the client side.

---

[36] http://business.time.com/2012/02/08/the-app-economy-estimated-to-contribute-nearly-half-a-million-jobs-to-the-u-s/ (accessed June 27, 2018)

48.     In alignment with Dr. Mandel's thesis concerning the importance of facilitating application development, the Plaintiffs' patented technologies, with a focus on accelerating application development for performance engineers, helped to enable a new generation of app developers to lay the foundation for the emerging App Economy (hereafter "App Developers").

49.     App Developers play an integral role in the app ecosystem, and Plaintiffs' patented innovations, with a focus on accelerating application development for performance engineers, have ushered in a new generation of smart developer tools and contributed significantly to the growth of the App Economy.

50.     Application performance and access to data in the cloud are paramount to the user experience for a new generation of data hungry applications.  If a mobile application fails, 48% of users are less likely to ever use the app again. 34% of users will simply switch to a competitor's application and 31% of users will tell friends about their poor experience, which eliminates future customers.[37]  A change in latency from 2ms (broadband) to 400ms (3G network) can cause a mobile page load to go from 1 second to 30 seconds.[38]  Google reported that a mere 0.5 to 1.0-second increase in page load time resulted in a 20% decrease in traffic and revenue.  The average U.S. retail mobile site loaded in 6.9 seconds in July of 2016, and according to the most recent data presented by Google, 40% of consumers will leave a page that takes longer than three seconds to load.[39]

51.     According to Defendant's own studies, *"over 70% of the performance of a mobile app is dependent on the network,"*[40] and in another study Defendant further stated that "80% of

---

[37] https://www.marketingcharts.com/digital-27846 (accessed June 27, 2018)
[38] https://www.slideshare.net/xbosoft/mobile-network-performance-testing (accessed June 27, 2018)
[39] https://www.thinkwithgoogle.com/marketing-resources/experience-design/mobile-page-speed-load-time/ (accessed June 27, 2018)
[40] Exhibit A

the costs associated with application development occur in remediating failed or underperforming applications after deployment, when the ineffective application has already had a negative impact on the end user or customer experience."[41]

52.     In 2018, 52.2 percent of all website traffic worldwide was generated through a mobile device.[42]   In the United States, not even Black Friday was immune from the influence of mobile as nearly 40% of sales on the traditional brick and mortar shopping day came from a mobile device. With 30% of all online shopping happening on mobile phones and with 89% of executives believing that customer experience will be their primary mode of competition, the consumer experience via a company's mobile app has never been so prevalent.[43]

53.     In a recent study released by Micro Focus, over 50 percent of respondents indicated the need to remediate at least four application production incidents per month and the average days required to resolve a production incident was six. [44]   Micro Focus further stated that the average remediation cost per incident was $88,000 USD and the highest reported cost was $500,000 USD per incident. [45]   Micro Focus stated that "it is important to note that this is the remediation cost alone; it is not an accounting of the total impact on the business."[46]   A single security breach of a customer's financial banking information via a mobile app can cause a massive client exodus.

54.     Millennials, in particular, are much less forgiving concerning their application experience and will unapologetically delete an app just because the logo is not appealing.[47]   This

---

[41] http://media.shunra.com/datasheets/Shunra-NetworkCatcher.pdf (accessed June 27, 2018)
[42] https://www.statista.com/statistics/241462/global-mobile-phone-website-traffic-share/ (accessed June 27, 2018)
[43] https://www.outerboxdesign.com/web-design-articles/mobile-ecommerce-statistics (accessed June 27, 2018)
[44] Micro Focus The Value of Proactive Application Performance, http://files.asset.microfocus.com/4aa6-6409/en/4aa6-6409.pdf  (accessed June 27, 2018)
[45] Id.
[46] Id.
[47] https://www.comscore.com/Insights/Blog/5-Interesting-Facts-About-Millennials-Mobile-App-Usage-from-The-2017-US-Mobile-App-Report (accessed June 27, 2018)

fact suggests a shrinking margin of error for performance issues especially when it is considered that "67% of Millennials now use mobile banking as their primary engagement with their bank compared to 18% for those consumers aged 60 or over.  In a recent study in the UK, Millennials now trust their App more than a teller at a brick and mortar bank, and 27% of Millennials are now completely reliant on a mobile Banking App.[48]  In the next 3-4 years, 33% of Millennials may choose to completely abandon traditional brick and mortar Banking in lieu of a mobile app.[49]  With over 50% of the United States workforce projected to be made up of 'App First Millennials' by 2020,[50] it is clear why Defendant had to move quickly into the Mobile-first product model.  The vast majority of Defendant's downstream clients have also initiated a 'Mobile-First' strategy to 'mobilize' their customer base to engage a new era of app users and as a result, have relied on the mobile testing products offered by Defendant.

55.    As the mobility wave continues to expand, mobile app development is expected to outpace native PC projects by at least 400% in the next several years,[51] and according to TechCrunch, in 2017 over 20,000 petabytes (that's over 20 million gigabytes) were sent using mobile devices.[52]

56.    With the release of the rebuilt mobilized HP 11.50 Software Suite in 2012 and the follow-up release of the HP 12.0 Software Suite in March of 2014, the Defendant as a late entrant was attempting to aggressively gain traction in the market.  Late adopters like the Defendant often face a critical inflexion point-- either pay fair and reasonable licensing fees to secure intellectual

---

[48] https://www.salesforce.com/blog/2016/03/stats-about-millennials-mobile-banking.html (accessed June 27, 2018)
[49] https://www.temenos.com/en/market-insight/universal-insight/33-of-millennials-believe-they-wont-need-a-bank-at-all-in-5-years-we-think-different/ (accessed June 27, 2018)
[50] https://www.forbes.com/workforce-2020/ (accessed June 27, 2018)
[51] http://2014.vertic.com/blog/year_of_the_enterprise_tablet_infographic/ (accessed June 27, 2018)
[52] https://techcrunch.com/2013/07/03/mobile-data-use-to-grow-300-globally-by-2017-led-by-video-web-traffic-says-strategy-analytics/ (accessed June 27, 2018)

property rights from existing stakeholders, or, instead, recklessly forge ahead with indifference to securing the necessary intellectual property rights.

57.     Notwithstanding the WIPO Patent Rejection of Defendant's patent application, the initial and supplemental WIPO notices and Defendant's knowledge of Plaintiffs' prior patent rights in the mobile application development space, Defendant recklessly forged ahead with the launch of its mobile performance offerings.  This recklessness was likely born from Defendant's desire in 2012 to strategically and without delay pivot from desktop offerings to a Mobile-First offering to remain competitive in mobile performance engineering.

<u>ROYALTY DEMAND BY PLAINTIFFS</u>

58.     App Developers play an integral role in the app ecosystem and Plaintiffs' patented innovations have helped to contribute to the foundational growth of the App Economy.[53]  With mobile phone sales expected to reach 2.1 billion units by 2019, or approximately one-third of the world's population, the pace of this unprecedented mobile demand will likely continue.[54]

59.     Having recognized the explosive growth of the mobile application ecosystem, Micro Focus publicly stated that its combined spin-out merger with the Defendant creates "One of the World's Largest Pure-play Software Companies."[55]  Underpinning the growth of the App Economy, as Dr. Mandel noted, is facilitating application development which is a core value proposition of Plaintiffs' inventions.  In light of the collective facts herein, and using a reasonable royalty rate, the patent royalties owed by Defendant to Plaintiffs are in excess of $400 million USD.[56]

---

[53] According to Gartner, by the end of 2017 the market demand for mobile app development services will grow five times faster than internal IT organizations' capacity to deliver them.
https://www.gartner.com/newsroom/id/3076817 (accessed June 27, 2018)
[54] *Id.*
[55] https://www.microfocus.com/about/press-room/article/2017/micro-focus-completes-merger-with-hpe-software/
[56] This estimated royalty does not take into consideration additional factors, including without limitation an award of triple damages for willful infringement.

## WILLFUL INFRINGEMENT

### MOBILE WORLD CONGRESS AND WIPO REJECTION

60.      Plaintiffs allege that Defendant and/or its predecessors-in-interest and/or its affiliates have been made aware of the Plaintiffs' Patent Portfolio as early as October 31, 2012 based on the WIPO Intellectual Property Rejection.

61.      Despite initial and continued notices provided by WIPO beginning in October of 2012, Defendant recklessly forged ahead with the launch of HP LoadRunner and HP Performance Center 11.50 offerings in 2012, and with the follow up release of HP LoadRunner and HP Performance Center 12.0 offerings for Mobile and cloud-based Application Testing in March of 2014 "to accelerate mobile and cloud-based testing and improve user experience while increasing cost savings and quality for the delivery of business-critical applications and services."[57]

62.      In the press release dated March 18, 2014, Defendant further stated that "to help organizations drive quality, performance and velocity into their mobile, cloud, hybrid and traditional applications, Defendant is unveiling **new versions of the products within its HP Application Lifecycle Management portfolio** [emphasis added]."[58]   Furthermore, to capture virtual and cloud-based testing, Defendant introduced HP LoadRunner 12 and HP Performance Center 12 "with new cloud testing capabilities designed to help organizations…increase cost savings with instant access to large-scale load-generation capabilities in the cloud. Enterprises can

---

[57] PALO ALTO, Calif. In a Press Release dated March 18, 2014, the Defendant stated the following: "HP today announced **new offerings to accelerate mobile and cloud-based testing and improve user experience while increasing cost savings and quality for the delivery of business-critical applications and services** [emphasis added]… To help improve continuous performance testing for capacity, scalability and reliability, **HP is introducing HP LoadRunner 12 and HP Performance Center 12 with new cloud testing capabilities designed to help organizations** [emphasis added] increase cost savings…and shrink overhead through an integrated management environment that automates provisioning of load generators in the cloud across geographically dispersed teams while maintaining security and control.." http://www8.hp.com/us/en/hp-news/press-release.html?id=1601722#.WyqeK1VKguU (accessed June 27, 2018)
[58] Id.

scale performance-testing resources on flexible cloud platforms based on business and geographic demands."[59]

63.     In addition to the HP 11.5 and 12.0 product offerings, Defendant announced the release of HP StormRunner Load in September of 2014 as part of the HP Performance Testing Suite[60] and the follow-up release of HPE Mobile Center in October of 2014.[61]

64.     Based on the WIPO Patent Rejection in October of 2012 of Defendant's patent application, and the supplemental notices from WIPO under Article 22(1) concerning the status of Defendant's rejected WIPO patent application, Defendant has had actual notice of Plaintiffs' Patent Portfolio and continued to offer, use and sell the Mobile Product Offerings despite an objectively high likelihood that its actions constituted infringement of Plaintiffs' patent rights.

65.     Notwithstanding this knowledge about Plaintiffs' patents and the importance of the mobile application development and testing innovations therein, Defendant has knowingly or with reckless disregard willfully infringed one or more of the Patents-in-Suit, and, accordingly, Plaintiffs seek enhanced damages from Defendant pursuant to 35 U.S.C. § 284.

66.     This objective risk was either known or so obvious that it should have been known to Defendant. Accordingly, Plaintiffs seek enhanced damages from Defendant pursuant to 35 U.S.C. § 284.

---

[59] *Id.*

[60] PALO ALTO, Calif. In a Press Release dated September 15, 2014 the Defendant stated the following: "HP today expanded the HP Performance Testing Suite with a new software solution focused on helping Agile development teams accelerate application quality and delivery via a simple, intuitive and scalable cloud-based platform.
HP StormRunner Load joins HP's existing performance testing solutions, which include HP LoadRunner and HP Performance Center. The modern enterprise faces a perfect storm of changes that are driving the need for a completely new approach to application delivery and testing. Businesses must develop applications that can instantly operate across a wide variety of platforms including thousands, or millions, of mobile devices." http://www8.hp.com/us/en/hp-news/press-release.html?id=1791344#.WyqigFVKguU PCT/US2012/024087

[61]     https://web.archive.org/web/20141205174207/http://www8.hp.com/us/en/software-solutions/mobile-testing/ (accessed June 27, 2018)

## COUNT I

(Infringement of United States Patent No. 9,971,678)

67.     Plaintiffs incorporate the paragraphs above herein by reference.

68.     On May 15, 2018, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,971,678 (the "'678 Patent") entitled "Systems Including Device and Network Simulation for Mobile Application Development" on an application filed Dec. 23, 2014, United States Patent Application Ser. No. 14/581,475.  The '678 Patent is a continuation of United States Patent Application Ser. No. 13/673,692, filed Nov. 9, 2012 and issued as United States Pat. No. 8,924,192, on Dec. 30, 2014, which is a continuation of United States Patent Application Ser. No. 12/759,543, filed April 13, 2010 and issued as United States Pat. No. 8,332,203, on Dec. 11, 2012, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006 and issued as United States Pat. No. 7,813,910, on Oct. 12, 2010, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

69.     The '678 Patent is presumed valid and enforceable.

70.     Plaintiffs are the sole owner of the '678 Patent.

71.     Defendant without authorization has directly infringed at least Claim 1 of the '678 Patent, including making, using (including for testing purposes), selling, and offering for sale systems for testing an application for a mobile device ("Accused System") including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ("HPE Software Suite").  *See* attached Claim Chart for the '678 Patent, at Exhibit 4, citing Exhibits A–G.

72.    The '678 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

73.    The '678 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '678 Patent at col. 7, lines 29-40 and col. 8, lines 45-56 [profile data 110 is stored or displayed to identify performance of the application].

74.    The '678 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '678 Patent at col. 2, lines 5-9 [geographical markets], col. 11, lines 49-59 and col. 12, lines 3-25 [Figure 9 and geographical map] to enable a user to import the network profiles, *see, e.g.,* '678 Patent at col. 12, lines 50-53 [import network profiles] into the testing environment, *see, e.g.,* '678 Patent at col. 10, lines 59-66 to col. 11, lines 1-14 [download network profiles].

75.    Technological improvements described and claimed in the '678 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.*, '678 Patent at col. 2, lines 5-9, col. 11, lines 60-67 and col. 12, line 2.

76.    The written description of the '678 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic,

or routine.  *See, e.g.,* '678 Patent at col. 10, lines 34-44 [simulated network environment] to col. 13, line 47 [includes Figures 8 through 13].

77.     The '678 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Google, Adobe and Amazon.  *See* https://patents.google.com/patent/US9971678/en (last accessed June 28, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

78.     Viewed in light of the specification of the '678 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

79.     The '678 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

80.     The '678 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

81.     The '678 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

82.     As noted by United States Patents, foreign patent documents, and other publications cited by the '678 Patent, the '678 Patent ***does not*** preempt the field of its invention or preclude use

of other methods and systems of simulating network systems to determine performance of the mobile device.

83.     As a result of Defendant's infringement of the '678 Patent, Plaintiffs have suffered damages.

84.     Defendant's infringement has been willful since at least October 31, 2012, when Defendant became aware of the '678 Patent family. *See* Defendant's international patent application, PCT/US2012/024087, which was rejected as anticipated by the '910 Patent; ¶¶ 60-66. The '678 Patent, the '864 Patent and the '192 Patent are the progeny of the '910 Patent.

## COUNT II

(Infringement of United States Patent No. 9,298,864)

85.     Plaintiffs incorporate the paragraphs above herein by reference.

86.     On March 29, 2016, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,298,864 (the "'864 Patent") entitled "System Including Network Simulation for Mobile Application Development" on an application filed Nov. 19, 2013, United States Patent Application Ser. No. 14/084,321.  The '864 Patent is a divisional of United States Patent Application Ser. No. 12/705,913, filed Feb. 15, 2010 (now United States Pat. No. 8,589,140), which claims priority to United States Patent Application Ser. No. 61/152,934, filed Feb. 16, 2009, and is a continuation-in-part of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006 (now U.S. Pat. No. 7,813,910), which claims priority to United States Patent Application Ser. No. 60/689,101, filed Jun. 10, 2005.

87.     The '864 Patent is presumed valid and enforceable.

88.     Plaintiffs are the sole owner of the '864 Patent.

89.     Defendant without authorization has directly infringed at least Claim 1 of the '864 Patent, including making, using (including for testing purposes), selling, and offering for sale systems for testing an application for a mobile device Accused System including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ("HPE Software Suite"). *See* attached Claim Chart for the '864 Patent at Exhibit 5, citing Exhibits A–G.

90.     The '864 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device. *See, e.g.,* '864 Patent at col. 9, line 60 through col. 10, line 3 [simulated network environment] to col. 13, line 4 [includes Figures 8 through 13].

91.     The '864 Patent describes systems that simulate virtual users to load test mobile applications by using an event generator to create scripts to emulate and model human behavior to determine performance of either the network or the mobile application. *See, e.g.,* '864 Patent at col. 10, lines 57-65 [event generator + scripted effects], col 11, lines 7-17 [event generator + bandwidth], col. 11, lines 51-67 [scripted events + human interaction]. The '864 Patent further describes systems that enable the performance engineer to simulate real-world scenarios by generating load from multiple geographies to emulate real networks during load tests. *See, e.g.,* '864 Patent at col. 11, lines 51-67 [scripted events + consumer events + performance], Figures 9, 10, 11, 12 and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

92.     The '864 Patent describes systems that enable the performance engineer to interact with the virtual users by providing scripts to record and replay user interactions on the mobile device to emulate real networks during load tests. *See, e.g.,* '864 Patent at col. 11, lines 51-67

[scripted events + consumer events + performance], Figures 12 [Load Server] and 13, col. 12, lines 8-11 [storage 134] and col. 12, lines 18-22 [geographic locations].

93.     The '864 Patent describes systems that include a developer server that provides a library of mobile devices to enable the performance engineer to combine virtual users and real devices to run tests from multiple geographies across real-world network conditions.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 [mobile devices in geographical markets], col. 3, lines 4-7 [development server + Internet], col. 9, line 60 to col. 10, line 3 [developer server + mobile device, figures 8-13], col. 11, lines 18-27 [developer server + networks worldwide], and col. 12, lines 8-11 [storage 134].

94.     The '864 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '864 Patent at col. 6, lines 46-57 [profile data 110 is stored or displayed to identify performance of the application].

95.     Technological improvements described and claimed in the '864 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.,* '864 Patent at col. 2, lines 3-7 and col. 11, lines 18-27.

96.     The written description of the '864 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '864 Patent at col. col. 9, line 60 to col. 10, line 3 [simulated network environment] to col. 13, line 3 [includes Figures 8 through 13].

97.     The '864 Patent represents a substantial technical improvement in the area of mobile performance engineering.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Apple, Intel, Adobe, Facebook, Ca, Amazon, Vodafone and Telecom Italia S.p.A.  *See* https://patents.google.com/patent/US9298864B2/en (last accessed June 26, 2018).  A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

98.     Viewed in light of the specification of the '864 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

99.     The '864 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

100.    The '864 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

101.    The '864 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

102.    As noted by United States Patents, foreign patent documents, and other publications cited by the '864 Patent, the '864 Patent ***does not*** preempt the field of its invention or preclude use of other methods and systems of simulating network systems in the area of mobile performance engineering.

103.    As a result of Defendant's infringement of the '864 Patent, Plaintiffs have suffered damages.

104.    Defendant's infringement has been willful since at least October 31, 2012, when Defendant became aware of the '864 Patent family. *See* Defendant's international patent application, PCT/US2012/024087, which was rejected as anticipated by the '910 Patent; ¶¶ 60-66. The '864 Patent, the '678 Patent, and the '192 Patent are the progeny of the '910 Patent.

## COUNT III

(Infringement of United States Patent No. 8,924,192)

105.    Plaintiffs incorporate the paragraphs above herein by reference.

106.    On Dec. 30, 2014 the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,924,192 ("the '192 Patent") entitled "Systems Including Network Simulation for Mobile Application Development and Online Marketplaces for Mobile Application Distribution, Revenue Sharing, Content Distribution, or Combinations thereof" on an application filed Nov. 9, 2012, United States Patent Application Ser. No. 13/673,692.  The '192 Patent is a continuation of United States Patent Application Ser. No. 12/759,543, filed Apr. 13, 2010, which is a continuation of United States Patent Application Ser. No. 11/449,958, filed Jun. 9, 2006, and issued as United States Pat. No. 7,813,910, on Oct. 12, 2012, which application claims priority to United States Patent Application Ser. No. 60/689,101 filed Jun. 10, 2005.

107.    The '192 Patent is presumed valid and enforceable.

108.    Plaintiffs are the sole owner of the '192 Patent.

109.    Defendant without authorization has directly infringed at least Claim 1 of the '192 Patent, including making, using (including for testing purposes), selling, and offering for sale the

Accused System including and not limited to the LoadRunner, Performance Center, StormRunner and Mobile Center software products ("HPE Software Suite"). *See* attached Claim Chart for the '192 Patent at Exhibit 6, citing Exhibits A–G.

110.    The '192 Patent describes systems that address technical problems related to simulating network systems to determine performance of the mobile device.  *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

111.    The '192 Patent describes systems that enable a performance engineer to view application performance data to mitigate performance risks.  *See, e.g.,* '192 Patent at col. 7, lines 14-25 and col. 8, lines 27-38 [profile data 110 is stored or displayed to identify performance of the application].

112.    The '192 Patent describes systems that include providing a network model library of real-world mobile network characteristics, *see, e.g.,* '192 Patent at col. 2, lines 4-8 [geographical markets], col. 11, lines 28-38 and col. 11, line 49 to col. 12, line 2 [Figure 9] to enable a user to import the network profiles, *see, e.g.,* '192 Patent at col. 12, lines 28-31 [import network profiles] into the testing environment, *see, e.g.,* '192 Patent at col. 10, lines 40-47 to col. 10, lines 51-62 [download network profiles].

113.    Technological improvements described and claimed in the '192 Patent were not conventional, well-known, or routine at the time of their respective inventions but involved novel and non-obvious approaches to problems and shortcomings prevalent in the art at the time.  *See, e.g.*, '192 Patent at col. 2, lines 4-8 and col. 11, lines 39-48.

114.    The written description of the '192 Patent supports each of the elements of the claims, allowing a person of ordinary skill in the technical art ("POSITA") to understand what the

elements cover and how the non-conventional and non-routine combination of claim elements differ markedly from and improved upon what may have been considered conventional, generic, or routine.  *See, e.g.,* '192 Patent at col. 10, lines 15-25 [simulated network environment] to col. 13, line 23 [includes Figures 8 through 13].

115.    The '192 Patent represents a substantial technical improvement in the area of simulating network systems to determine performance of the mobile device.  As demonstrated by its frequent citation, Plaintiff's Performance Engineering Innovations have been cited over thirty times against a number of industry-leading companies as prior art by the United States Patent and Trademark Office and the World Intellectual Property Organization, including citations against Google, Apple, Adobe, Amazon, and Intel.  *See* https://patents.google.com/patent/US8924192B1/en (last accessed June 26, 2018). A larger listing of companies whose patents have cited Plaintiffs' Patent Portfolio is provided above in ¶ 15.

116.    Viewed in light of the specification of the '192 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.

117.    The '192 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.

118.    The '192 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.

119.    The '192 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.

120.     As noted by United States Patents, foreign patent documents, and other publications cited by the '192 Patent, the '192 Patent *does not* preempt the field of its invention or preclude use of other methods and systems of simulating network systems to determine performance of the mobile device.

121.     As a result of Defendant's infringement of the '192 Patent, Plaintiffs have suffered damages.

122.     Defendant's infringement has been willful since at least October 31, 2012, when Defendant became aware of the '192 Patent family. *See* Defendant's international patent application, PCT/US2012/024087, which was rejected as anticipated by the '910 Patent; ¶¶ 60-66. The '192 Patent, the '678 and the '864 Patent are the progeny of the '910 Patent.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Enter judgment that Defendant has infringed one or more claims of the '678 Patent literally or under the doctrine of equivalents;

B.     Enter judgment that Defendant has infringed one or more claims of the '864 Patent literally or under the doctrine of equivalents;

C.     Enter judgment that Defendant has infringed one or more claims of the '192 Patent literally or under the doctrine of equivalents;

D.     Award Plaintiffs damages for willful infringement of the '678 Patent, the '864 Patent and the '192 Patent;

D.     Award Plaintiffs past damages, to be paid by Defendant, in an amount no less than a reasonable royalty and adequate to compensate Plaintiffs for such damages, together with pre-judgment and post-judgment interest for Defendant's infringement of the '678 Patent, the '864

Patent and the '192 Patent through the date that such judgment is entered in accordance with 35 U.S.C. §284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. §284;

E.     Declare this case exceptional under 35 U.S.C. §285; and

F.     Award Plaintiffs their costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  July 2, 2018

Respectfully Submitted,

*/s/ Jeffrey G. Toler*
Jeffrey G. Toler
Texas State Bar No. 24011201
jtoler@tlgiplaw.com
Aakash S. Parekh
Texas State Bar No. 24059133
aparekh@tlgiplaw.com


TOLER LAW GROUP, PC
8500 Bluffstone Cove, Suite A201
Austin, Texas 78759
Tel. (512) 327-5515
Fax (512) 327-5575

**ATTORNEYS FOR PLAINTIFFS
WAPP TECH LIMITED PARTNERSHIP AND
WAPP TECH CORP.**